STEVEN G. KALAR
Federal Public Defender
GABRIELA BISCHOF
Assistant Federal Public Defender
450 Golden Gate Avenue, 19th Fl.
San Francisco, CA 94102
Telephone:     415.436.7700
Facsimile:      415.436.7706
Email:          Gabriela_Bischof@fd.org

Counsel for Defendant Cauich Carbajal

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LUIS GONZALO CAUICH CARBAJAL,<br><br>Defendant. | No. CR 14-00651-001 TEH<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>Date: March 14, 2016<br>Time: 2:30 p.m.<br><br>Hon. Thelton E. Henderson |

## INTRODUCTION

Defendant Luis Gonzalo Cauich Carbajal will stand before this Court for sentencing on March 14, 2016, for a single violation of 18 U.S.C. § 2252(a), receipt of child pornography. Consistent with the plea agreement of the parties under Federal Rule of Criminal Procedure 11(c)(1)(C), Mr. Cauich respectfully submits that a sentence of 120 months is warranted based on the aberrant nature of his behavior, his role in the offense, and his previously unblemished criminal record. He further requests that the Court impose a ten-year term of supervised release with the search conditions set forth in the plea agreement, and a $100 special assessment.

# BACKGROUND

## A. History and Characteristics of Mr. Cauich

Luis Gonzalo Cauich Carbajal was born on June 21, 1966, in a small town in the Yucatan in Mexico. PSR ¶ 54. His parents were Mayan, and Maya is his native language. PSR ¶ 74. The family lived on a *rancho;* his father is a laborer and his mother is a homemaker. *PSR* ¶ 54. His family did and still does have limited financial means, but his childhood was a happy one and his parents worked hard to keep food on the table. He was the oldest of four children. *Id.* As a child, he attended school but he was "hard-headed" and struggled, eventually completing primary school at age 15. PSR ¶ 72. Thereafter, his parents had no money for him to continue school and he began working. *Id.*

From his youth onward, he always endeavored to do what was expected of him. He married his wife, Alfonsa, at a very young age, and their union produced four children. PSR ¶ 58. Like his two younger brothers and his father, he became a construction worker. PSR ¶ 55. For many years, his life was centered around work and his family. In the early 2000s, the economy in the Yucatan was floundering, and he could not find any work. All of his children were then underage and needed to be supported. In 2002, he left his home and family in the Yucatan to seek work in the United States. PSR ¶ 59. He remained in the United States for seven years, working as a drywaller in Marin County. PSR ¶ 59; 77. He also did flooring, construction, and other projects to make extra money to send home to his family. PSR ¶ 79. His oldest son Luis, who also came to the United States to work and lived with his father in the United States, described him as a loving father who always treated his children well. PSR ¶ 66.

Mr. Cauich returned to Mexico to see his family in 2009, but the seven year separation had taken a toll on his marriage to Alfonsa. PSR ¶ 59. When he met Lilia Baesa at a party, the two embarked on a romantic relationship. PSR ¶ 60. She was significantly younger than he was, and she captivated him. *Id.* She had four children from previous relationships and was struggling to provide for them as a housekeeper. *Id.* Mr. Cauich wanted to save her from that existence. Now that his own children were grown, he imagined he would continue his role as the family man with Ms. Baesa and send money to her

and her children after he returned to the United States. PSR ¶ 61. Their courtship was intense; within a few months of meeting, Mr. Cauich had moved in with Ms. Baesa, but lived with her only eight months before returning to the United States. PSR ¶ 59.  He returned to Mexico for a few months in 2013, but the couple were often separated. *Id.* Mr. Cauich tried to be a second father to Ms. Baesa's children, and never touched any of the children inappropriately. PSR ¶ 60. Mr. Cauich emphatically denies ever touching *any* child inappropriately.

### B. Nature and Circumstances of The Offense

When Mr. Cauich was in Mexico with Ms. Baesa, she was loving and attentive, but when he returned to the United States, she became obsessive and jealous. See attached Ex. A., Psychological evaluation by Dr. Scott Lines. The couple communicated primarily through WhatsApp, a free international text messaging service. PSR ¶ 20. The chat logs (produced and translated by the government) reveal the evolution of their relationship and of the offense itself.

First, Ms. Baesa became obsessive and jealous. Mr. Cauich had previously confided in her that he fantasized about being with a virgin. To secure his love and loyalty, she wanted to offer him something no other woman would: the virginity of her youngest daughter, G., who was then ten years old.[1] Mr. Cauich treated her suggestion as a fantasy that they both discussed, but never intended for it to go further. As he had in the past, Mr. Cauich knew he would stay in United States for six, seven, or more years. He assumed that G. would find a partner her own age by the time he returned, and he would never have to confront the possibility of the fantasy becoming reality. PSR ¶ 21. Then, however, G. became ill with a vaginal infection. The doctors in Peto could not diagnose the illness, and the symptoms kept returning. Initially, Ms. Baesa sent Mr. Cauich photographs of the infection because she did not know what to do and wanted his advice. Although the agents who arrested Mr. Cauich found this turn of events implausible and even told him that such a story would never be evidenced by the chat messages, it is clear from the chats that this is exactly what happened. Once the infection healed, Ms. Baesa initially took it upon herself to create and send explicit photographs, and eventually videos, of G.'s

---

[1] Although Ms. Baeza had an older daughter, she was already a teenager and it was implied that she already had a partner.

*DEF.'S SENTENCING MEM.*
LUIS GONZALO CAUICH CARBAJAL, 14-00651-001 TEH                                                                                   3

vaginal area, G. in explicit poses, and G. masturbating. Instead of demanding that Ms. Baesa stop sending the images, Mr. Cauich was complicit in their creation. Although the chats show that he initially expressed discomfort, he eventually admitted he found the images arousing. When Ms. Baesa asked if he liked the images and wanted her to send more, he requested that she send more.

1. Problems in the Relationship

As soon as they begin to communicate using WhatsApp, her messages are of obsessive love: "I love you too much my heart." "My love I am suffocating I am in agony once again." Gov't Discovery LC 00073 at p. 7, June 9, 2014. See Ex. A at p. 3. Nearly every day she sent similar messages requesting attention, expecting reassurance, and often did not receive it. Her constant emotional needs made it difficult for Mr. Cauich to work. He tried to explain his lack of responses by occasionally sending photographs of his work and terse messages about it. "We are putting up a beam" *Id.* at 231, June 21, 2014. In that exchange, he was asking to be left alone but was clearly fearful of openly confronting her. Living in the United States away from family was very lonely. In some of the text messages, Mr. Cauich and Ms. Baesa exchange images of their dinners and pretend they are having a meal together. In spite of her jealousy, Mr. Cauich was afraid to lose her. Still, e Ms. Baesa admitted that her neediness was out of control: "I'm sorry also for being jealous but I love you so much that is why I get this way." *Id.* at p. 234, June 21, 2014.  Still, the messages continued. "I just miss you too much darling I feel as though it has been years without you I'm dying without you." *Id.* at p. 828, July 25, 2014. When he does not immediately respond to her chats, she says: "Hey honey why don't you answer the messages are you with some woman? Just tell me the truth honey and I will know how to understand you." *Id.* at p. 1779, October 5, 2014.

2. The Illness

In September, G. came down with a full-body infection that would not heal. "You know I'm going to take the girl to the doctor [because] I don't know what she Has," Ms. Baesa writes. Gov't Discovery LC 00073 at p. 1606, September 22, 2014. From an outsider's perspective, it seems improbable that Ms. Baesa would turn to Mr. Cauich for advice on her daughter's illness. Certainly, he

was not a doctor, but both have limited education and are deeply superstitious. Moreover, in their culture, it is typical for the patriarch to make all important decisions. When it appears that the doctors have been unable to help, the two consider alternatives, like taking G. to a traditional healer to have her fortune looked at. Ms. Baesa says: "No I'm not upset I'm worried because the girl is still [sick] I don't know what is wrong the medicine works and her malady returns." *Id.* at p. 1649, September 25, 2014. Mr. Cauich responds: "Well have diagnosis or analysis made because [untranslated word] you took her to doctor and she hasn't healed if we see that nothing comes up then we take her to have her fortune looked at but we are not going to stay with our arms crossed okay honey." *Id.* Two days later, they discuss the illness again: "Hello how is the girl[?]" Mr. Cauch asks. *Id.* at p. 1668, September 27, 2014. She responds: "She is better honey well her head doesn't ache and she is not vomiting nor does her tummy ache but I don't know how her Little thing is doing because I haven't checked it still I will check it in a little while I'll send you the photo to see how it continues that okay honey?" In turn he says: "That's fine mamma anyway get ready to take her to the doctor okay honey." *Id.* at 1669. "If you send me the photo yes the cream for where the infection is okay." *Id.*

After nearly two weeks, the infection subsided. On October 1, 2014, Mr. Cauich inquires: "Changing the subject honey is the girl getting better did her purple [bruising?] go away?" *Id.* at p. 1728. Ms. Baesa responds: "Yes honey you can see the change right her Little thing is no longer so red." *Id.* At this point, there is no reason for Ms. Baesa to continue to send images of G.'s vagina, but she continues to do so.

3. The Offense Conduct

Mr. Cauich previously confided in Ms. Baesa about his fantasy of having sex with a virgin, and she saw an opportunity to ease her insecurities by offering him something she believed no other woman could give him. She writes: "Well you know that you now have my approval for that my love it's proof of my great love for you." Gov't Discovery LC 00073 at p. 1770, October 4, 2014. "Imagine making love and having in your hands the innocence of a girl and know it will be the best for you don't you feel

*DEF.'S SENTENCING MEM.*
LUIS GONZALO CAUICH CARBAJAL, 14-00651-001 TEH                                                    5

it that way Little love." *Id.* He is clearly uncomfortable, and responds: "Stop saying things we'll see what happens time will tell okay mamma" *Id.*

Throughout their relationship, Ms. Baesa and Mr. Cauich sent explicit photographs of themselves to each other via WhatsApp. PSR ¶ 8. Most of the explicit photographs found on the phone were of Ms. Baesa and Mr. Cauich. However, after G.'s illness, Ms. Baesa began to create and send explicit photographs and videos of G. to Mr. Cauich, intermingled with the images she sent of herself. She constantly asked him for assurance that he liked them and wanted her to create and send more. Instead of forcefully demanding that she cease creating and sending them, he initially reacted lukewarmly and told her she should not send the photographs. In one exchange, she asks for reassurance and he says: "You can't imagine how much I'm enjoying it sweetie. Thank you." Gov't Discovery LC 00073, Phone 2 at p. 30, October 11, 2014. Unsatisfied, she pressed further: "Are you excited (aroused) my papi?" *Id.* His response was: "Not much babe, but (they're) lovely, thanks." *Id*. She sensed his hesitance but did not stop. During one exchange, she says: "Babe, sometimes I think you don't want to make love to the girl. I'm only pushing her on you…" and he then appeases her. *Id.* at p. 71, October 12, 2014. Nevertheless, Mr. Cauich found himself excited by the photographs and eventually requested that she send more. PSR ¶ 22.

In part, he was afraid to confront her out of fear that her jealousy and insecurity would spiral out of control. At the same time, he was aroused by the pornographic nature of the images and their interaction with his fantasy, and was conflicted about receiving them. It was the combination of these factors that resulted in his active participation in the offense. When he was initially interviewed by Richmond Police Officers, he admitted that, over time, when he viewed the photos of G. he became excited, but in the back of his mind he realized she was his "daughter." PSR ¶ 20. As a result, he only masturbated to the photos of Ms. Baesa. PSR ¶ 21. Even during his first interview, he apologized for his behavior. *Id.* The police found no other images or videos of child pornography on either phone. There was also no indication that Mr. Cauich further distributed any of the images or videos of G.

Mr. Cauich is a deeply religious man. At the time of this incident, he felt that he had wandered from God's path. He was only going to church once a month. PSR ¶ 63. He deeply regrets his conduct in this case, and has accepted responsibility by admitting to his conduct, refraining from litigating this case in any way, and accepting a plea agreement with a minimum ten year sentence. He is grateful that he was caught, and views this time as an opportunity for self-reflection and to learn and follow God's will. He believes that any sentence he will receive is from God, and is God's divine justice.

## DISCUSSION

In sentencing Mr. Cauich, this Court must consider all of the directives set forth in 18 U.S.C. § 3553(a); the sentencing guidelines are only one factor among many to be considered by the Court. See *United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 552, U.S. 85, 128 S. Ct. 858, 570 (2007). "The overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than necessary" to achieve the goals of section 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted). Those goals include the need to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

Section 3553(a) directs the court to consider a number of additional factors, including the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent Sentencing Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

*DEF.'S SENTENCING MEM.*
LUIS GONZALO CAUICH CARBAJAL, 14-00651-001 TEH                    7

### A. A Downward Variance Is Justified to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) directs courts to consider the need to avoid unwarranted sentencing disparities between similarly situated defendants. Similarly situated (and arguably more culpable) defendants in this District have often received sentences well below the 210 month sentence sought by the government, and also below the 168 month sentence recommended by Probation in this case. The Court should take the following cases into consideration when sentencing Mr. Cauich. In *United States v. Craig Burt*, CR 15-00137-TEH, the defendant flew to and from the Philippines multiple times, purportedly engaged in charity work for Children's Grace, a charity for impoverished children. See *Government's Sentencing Memorandum*, Docket No. 21 at p. 2. For four years, the defendant corresponded with a woman in the Philippines who had custody of several young girls, ages 10 to 13. *Id.* In exchange for financial support, the woman had the girls pose for nude photographs and nude webcam shows that they would send to the defendant, with some depicting the girls engaged in sexual acts or lasciviously displaying their genitals. *Id.* He stated in numerous text conversations that he was looking forward to engaging in sexual contact with the girls, and, unlike in the present case, Mr. Burt actually flew to the Philippines to do so, although it appeared he was not successful. *Id.* The government requested a 151 month sentence, the defense requested a 121 month sentence, and Probation recommended a 136 month sentence. Although the defendant engaged in more troubling conduct than Mr. Cauich, over a longer period of time, he received a 127 month sentence.

In *United States v. Alfredo Cetzal-Cuyoc,* CR 12-00525-EMC, the defendant was found in possession of over 75,000 child pornography images "mostly of young children being violently abused", had purposefully shown that child pornography to his boyfriend's 11-year-old son, and had surreptitiously recorded child pornography videos of the same boy masturbating in his room and in his bathroom. See *Government's Reply To Defendant's Sentencing Memorandum,* Docket No. 24 at p. 2. Although the government and Probation recommended a 240 month sentence, Mr. Cetzal-Cuyoc was sentenced to 135 months, the sentence requested by the defense. In that case, unlike in Mr. Cauich's case, the defendant was personally responsible for the production of the child pornography and arguably

*DEF.'S SENTENCING MEM.*
LUIS GONZALO CAUICH CARBAJAL, 14-00651-001 TEH                                                                 8

engaged in a sexual act with a child (watching the child pornography with his boyfriend's 11-year-old son), yet he still received a sentence lower than the one sought by Probation and the government in Mr. Cauich's case.

In *United States v. Omar Ahmad*, CR 13-00374-JD, the defendant had sexual intercourse with, pimped, and created child pornography images and videos of two 15-year-old identical twin boys. See *Government's Sentencing Memorandum*, Docket No. 54 at p. 6. For two years, the defendant "advertised them on the Internet, took videos of them engaged in sexual activity with him and, most tragically, each other, and posted the videos on the Internet as revenge for the minors going against him or 'stealing' from him when they failed to provide him with money from a commercial sex act." *Id.* at p. 7. Nevertheless, the government recommended and the defendant received a sentence of 63 months. Of its recommendation, the government wrote: "The government agrees with the Probation Office that defendant's crimes are extremely serious and warrant this significant period of incarceration." *Id.* at p. 6. Mr. Cauich does not seek to downplay the seriousness of his conduct, and accordingly requests a truly significant sentence: **ten years in custody**. Nevertheless, in light of the sentences received by the more culpable defendants above, a sentence greater than ten years would create an unnecessary disparity between defendants.

### B.  A Departure Or Variance Is Warranted Based on Mr. Cauich's Role in the Offense

Mr. Cauich agrees with the calculations contained in the plea agreement and PSR that his total offense level is 37, his criminal history category is I, and the resulting guideline range is 210 to 262 months. Nonetheless, he submits that a substantial departure or variance is warranted because he did not personally create, produce, or distribute the images and videos.

Although Mr. Cauich pleaded guilty to 18 U.S.C. § 2252(a), receipt of child pornography, the guideline used in the plea agreement and in the PSR is the guideline for production of child pornography, U.S.S.G. § 2G2.1. This is correct, because Mr. Cauich solicited and aided and abetted the production. See U.S.S.G. §§ 1B1.2(a), 1B1.3(a) (the offense level shall be determined on the basis of

*DEF.'S SENTENCING MEM.*
LUIS GONZALO CAUICH CARBAJAL, 14-00651-001 TEH                                                                 9

"all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant"). Nevertheless, prior dispositions have calculated the guidelines based on the offense of conviction, not on the most serious relevant conduct, resulting in lowered guidelines, which adequately account for the fact that a defendant did not personally produce or distribute the images. For instance, in *United States v. Burt*, *supra,* although the defendant clearly solicited and caused the production of child pornography, his guidelines were in part calculated using U.S.S.G. § 2G2.2, the guideline for receipt. The base offense level of § 2G2.2 is a full *10 levels* lower than the base offense level for production, § 2G2.1. Even "travelling with intent to engage in illicit sexual conduct" under § 2G1.3, the other guideline used in the *Burt* case, has a base offense level *8 levels* lower than the base offense level for production, § 2G2.1. Similarly, in *United States v. Omar Ahmad,* although the defendant had actually personally produced child pornography of the victims, the guidelines were calculated using § 2G1.3, travelling with intent to engage in illicit sexual conduct, resulting in guidelines significantly lower than any generated by the production guideline. Here, Mr. Cauich did not personally create or produce the images, nor did he further distribute the images that were sent to him. Probation agrees that "a variance is appropriate since [Mr. Cauich] was subjected to higher guideline calculations based on his production charge to which he did not plead guilty. While he admitted to requesting the images and videos, he was not responsible for creating or producing them." PSR Recommendation at p. 2. Rather than using the incorrect guideline, a downward departure or variance is the appropriate way to account for these circumstances.

### C.  The Remaining  § 3553(a) Factors Support the Imposition of a 120 Month Sentence

A downward variance to a sentence of 120 months is also warranted by several other § 3553(a) factors, namely, Mr. Cauich's unblemished criminal record, Mr. Cauich's strong family ties, the absence of any mental illness or drug dependency, that this conduct constituted aberrant behavior, and the resulting low likelihood of recidivism. A court may vary downward for "aberrant conduct" where the defendant has no prior criminal history. *United States v. Morales*, 972 F.2d 1007, 1011 (9th Cir. 1993).

*DEF.'S SENTENCING MEM.*
LUIS GONZALO CAUICH CARBAJAL, 14-00651-001 TEH                                                                       10

Mr. Cauich has never before, in 49 years, been in trouble with the law. He has worked tirelessly to better his family's circumstances, and maintained strong family ties with his four children, his parents, and his three siblings. This was a crime of opportunity, which began with a grievous failure on his part to put a stop to conduct he knew was wrong. Nevertheless, it is clear that Mr. Cauich has never before participated in or sought out sexual contact with a minor. Although police recovered two phones from him with text messaging applications, photograph and video storage, and email, there was no evidence of any other child pornography on either phone or chats with or about minors. Mr. Cauich's son confirmed that Mr. Cauich was always a good father to his four children, and there is no indication that he was ever accused of acting inappropriately toward a child before. If he had not separated from his wife and met Ms. Baesa, it is unlikely he would ever have acted on his desires - desires he did not even realize he had.

Moreover, Mr. Cauich has no history of mental illness or substance abuse. He has turned to his religious faith to correct his conduct, and is open to any programs available to him. After completing a thorough psychological evaluation, Dr. Lines concluded that Mr. Cauich is "not someone seeking sexual stimulation and/or contact with juveniles. If he were to be released, my clinical sense, derived from having evaluated several dozen individuals involved in child pornography and contact sexual offenses, is that he would present little-to-no risk of harm to the community from either conduct involving child pornography or from a contact offense." See Ex. A at p. 5. Moreover, because "the propensity for sexual offenses tends to diminish with age," and Mr. Cauich will be approximately 60 years old when he is released from custody, he presents even less of a danger to the public. *Id.* It is almost certain that Mr. Cauich will be deported upon his release from prison. It is his desire and plan to return to his wife Alfonsa and adult children in Mexico to reestablish the law-abiding existence he maintained for so long. A sentence of 120 months is sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, and impose just punishment, as well as to ensure adequate deterrence, protect the public, and provide Mr. Cauich with correctional treatment in the most effective manner.

**CONCLUSION**

For all of the foregoing reasons, Mr. Cauich respectfully requests that the Court impose a sentence of imprisonment of 120 months, followed by 10 years of supervised release including the search conditions agreed to by the parties in the plea agreement, and a $100 special assessment.

Dated: February 29, 2016

Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender

_____/s/_____

GABRIELA BISCHOF
Assistant Federal Public Defender

*DEF.'S SENTENCING MEM.*
LUIS GONZALO CAUICH CARBAJAL, 14-00651-001 TEH                                                12